Bradbury, C. J.
Upon the trial of this cause the plaintiff in error excepted to a number of rulings made by the trial court, only one of which we think merits consideration here, namely: the exception taken to the refusal of the court to give to the jury that proposition of law requested by plaintiff in error, which relates to the proof necessary to constitute one an aider and abettor of a homicide occurring upon a sudden quarrel, where the proof is insufficient to establish a prior conspiracy.
Over many of the circumstances that occurred on the day of the homicide, and which led up to it, there seems to have been no substantial controversy. The record discloses that the plaintiff in error resided and kept a saloon at McArthur Junction, a small village located where the track of The Columbus, Hocking Valley and Toledo Railway Compan3'- and that of The Baltimore and Ohio SouthWestern Railroad Company cross each other; that Geo. T. Ewing was the station agent there; that mutual enmity existed between Ewing and the plaintiff in error; that the saloon of plaintiff in error was situated a hundred feet or more from the station buildings; that the plaintiff in error in the early part of the day of the homicide was intoxicated, and continued in that condition until after the homicide occurred, which happened near the middle of the afternoon ; that Ewing was absent from the station most of the day until about one o’clock when he returned; and that during his absence the plaintiff in error came up about the platform and station building, exhibiting special ill-will towards Ewing, and one or two other employes about the station, and ill-will generally towards the rest of them, applying to him and to them vile and abusive epithets, though exhibiting no ill feeling toward the deceased personally.
*287 So far as the record discloses, the plaintiff in error had become 'quiet before the return of Ewing, though for how long before is left uncertain. Ewing, after his return, though how long thereafter is not made quite clear, walked along the station platform to a point nearly opposite the saloon of plaintiff in error, where he and the latter engaged in a quarrel, on the termination of which the plaintiff in error seems to have entered his saloon while Ewing returned to his office. A short interval, fixed by one witness at one hour and twenty minutes, occurred now, during which little, if anything, transpired, unless the plaintiff in error may have occasionally indulged in boisterous language addressed to no one in particular. At the expiration of this period he started from his residence or saloon towards the, station with, a ginger ale bottle in. his hand; he came near the deceased, and they engaged in a sharp and short quarrel, which resulted in the deceased going' to the railroad office, getting Ewing’s revolver, and starting to return towards the plaintiff in'error; Ewing and Uyons, another employe about .the station, took the revolver from the deceased, and all three moved in the direction of the plaintiff in error, who about this time was joined by his two sons and his wife; an encounter followed in which Henry Woolweaver, a son of the plaintiff in error, shot and killed the deceased. There were many other .circumstances. and facts over and about which the parties contested, and which for that reason are unnoticed in the general statement of what seems not to have been controverted.
The plaintiff in error did not fire the fatal shot, and, therefore, if a party to the homicide, became such either because of a prior conspiracy, that made him a party to the act of his son, by reason of inciting or encouraging his son at the time of its commission, or by some overt act of his own, designed or done with a view to bring about that result.
The proposition requested, and which the court declined to give to the jury, reads as follows: “In the absence of a conspiracy, one who is present when • a homicide is com *288 mitted by another upon a sudden quarrel, or in the heat of passion, is not guilty of aiding and abetting the homicide, although he may become involved in an independent fight with others of the party of the deceased, unless he does some overt act with a view to produce that result, or purposely incites or encourages the principal to do the act ; and so in this case, if you find the defendant on trial, although present at the time of the shooting, knew nothing of his son Henry having a revolver, or intending to shoot, and took no part in the killing, and done no overt act to produce that result, then he is in no way responsible, and must be acquitted, unless you find from the evidence, and beyond a reasonable doubt, that the shot was fired by Henry in pursuance of a conspiracy previously formed by them.”
This proposition the court modified by erasing the words “with a view,” and inserting in their place the word “tending,” so as to make it read “unless he does some overt act tending to produce that result,” and gave it to the jury as thus modified. If there was no prior conspiracy, and the act was committed upon a sudden quarrel, without the plaintiff in error having purposely incited or encouraged the perpetrator thereof, he ought not to be held to have a guilty connection therewith, unless he did some overt act “with a view,”—that is for the purpose—-to produce the result he is charged with aiding and abetting, for in such a state of fact no criminal intent would exist. But, under the rule of law embraced in this proposition, as modified and given to the jury, the plaintiff in error might have been convicted without proof of a guilty purpose, and when he had a casual connection only with the homicide; for it authorized a verdict of guilty if he did any overt act that tended in any degree to cause the death of the deceased, although the act was done by him without any purpose to cause that result, and in fact did not produce it; and although there was neither a previous guilty conspiracy, nor any incitement or encouragement, purposely given, by him, at the time, to the actual perpetrator of the homicide.
*289 Whenever a father engages in a fight, the tendency of that act is to incite a son, who may be standing by, to acts of violence, either towards the immediate antagonist of the father, should there be but one, or towards the party of that antagonist if there should be more than one; this tendency may be affirmed in respect to many other ties of kindred, or in many instances of merely close companionship. What rash or violent act the by-standing son, kinsman or comrade, may be moved to do, depends in a great measure upon the quality of his temper, the strength of his affection, and the notion, often mistaken, that he may hastily gather under the excitement of the moment, as to who is in fault and to be held responsible for bringing on the conflict. And if the by-standing son, other kinsman, or comrade, should, of his own volition, by an independent act of violence, slay the antagonist, the party engaged in the fight should not be charged with this act merely because he was engaged in a conflict with the deceased, and in that way, but in that way only, incited the fatal act. This is not enough to show a criminal intention; something more must appear; he must have purposely incited or encouraged the party in that course of violence that led to the homicide, or done some overt act himself, with a view to that result, and that in some degree contributed thereto. This is the principle that underlies the eighth clause of the syllabus in the case of Goins v. The State, 46 Ohio St. 457.
True, in the Goins case, supra, the plaintiff in error, at the moment of the killing, was engaged in an independent struggle with a person other than the one wht> was killed, but Goins was of the party with the one who gave the fatal stab, and his immediate antagonist was of the party of the one who received the death wound. In the case under consideration, there was evidence tending to show that the plaintiff in error and his two sons, composed one party, while the deceased and Mr. Ewing, and probably Mr. Ryons, composed the other party. • This difference in the circumstances in no wise affected the principles by which the criminal character of the acts of the parties should be tested. If there was a conspiracy, each conspirator was chargeable with *290 the acts of his co-conspirators; if there was no conspiracy, then upon the springing up of a sudden fight, each should be chargeable only with his own acts, and such acts of the others as he may purposely incite or encourage. The charge in the form in which it was requested, correctly stated this proposition.
Where satisfactory proof of a conspiracy has not been produced, it often becomes a nice and difficult matter to determine the criminal liability of each of a party of friends or kindred for the violent and unlawful acts of his fellows, committed in the course of a conflict, arising upon a sudden quarrel, with one or more antagonists.; and in such case, upon the trial of one of them, it is of the first importance that the correct rule of liability should be laid down to the jury; and if the instructions should extend, too far, the liability of the one on .trial for the acts of his fellows, it would be, necessarily, prejudicial to his lights. Therefore, as the proposition, in the form requested by the plaintiff in error, prescribed the correct rule of liability in the absence of proof of a conspiracy, it should have been given to the jury, and any modification that extended the liability, as thus prescribed, must be regarded as erroneous.

Judgment reversed.